ROBERT WISNIEWSKI P.C.
17 State Street, Suite 820
New York, NY 10004
(212) 267-2101
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PRADEEP KRIPALANI,                                          :

                    Plaintiff,                 :     **Docket No.:**

      -against-                                           :     **JURY TRIAL DEMANDED**

GROUND SERVICES INTERNATIONAL           :
INCORPORATED d/b/a dnataUSA
                                                     :
                    Defendant
------------------------------------------------------------X

## COMPLAINT

Plaintiff Pradeep Kripalani ("Plaintiff"), by his attorneys Robert Wisniewski P.C., as and for his Complaint against Ground Services International Incorporated, d/b/a dnataUSA (the "Corporate Defendant") states as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this diversity action against the Corporate Defendant for violation of New York Labor Law §740 ("NYLL") which prohibits all employers from discharging, suspending, demoting, or otherwise retaliating against an employee because the employee, among other independent actions, discloses to a supervisor or to a public body an unlawful activity, policy or practice of the employer that creates and presents a substantial and specific danger to the public safety or objects to or refuses to participate in

        any such activity, policy or practice in violation of a law, rule or regulation.

2. Plaintiff was employed by Corporate Defendant as a Director of Training based at JFK Airport in Jamaica, NY from December 30, 2019 until his pretextual termination on March 1, 2022 absense of use of it's robust discplinary process should the Plaintiff work have been otherwise sub-standard.

## PARTIES

3. Plaintiff is a former employee of the Corporate Defendant. At all relevant times, Plaintiff was and is a resident of the State of New York, County of Nassau.

4. Corporate Defendant, at all relevant times, has been a foreign business corporation duly authorized to do business within the State of New York whilst its principal place of business has been in Orlando, Florida.

## JURISDICTION AND VENUE

5. This Court has personal jurisdiction over the Corporate Defendant because it conducts substantial business in the State of New York and derives substantial revenue from the State of New York and because substantial events relating to the claims herein occurred in New York State.

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute involves citizens of different states. See 28 U.S.C § 1332 (a).

7. This Court is a proper venue for this action, pursuant to, among other grounds, 28 U.S.C. §1391(b), because substantial events relating to the claims herein occurred in this district.

**JURY DEMAND**

8. Plaintiff demands a trial by jury of all issues so triable in this action.

**FACTUAL BACKGROUND**

9. Corporate Defendant, an aviation services company, is engaged in the business of providing airport ground services at several airports in New York and New Jersey to approximately 120 foreign and United States air carriers as well as logistics companies, such as United Parcel Service ("UPS"), British Airways, Air France and All Nippon Airways.

10. In or about December, 2019, despite Corporate Defendant's business of providing almost 100% services to passenger and cargo airlines, less than 1% of its employees and leadership had ever worked directly for any foreign and/or United States airlines.

11. Prior to being hired by Corporate Defendant, Plaintiff had over thirty-five (35) years' experience in aviation, at both domestic and international airlines, in both Eastern and Western Hemispheres, and held varied and progressively high level positions, requiring a high degree of professional career certifications from the Federal Aviation Administration ("FAA"), Civil Aviation Authority of Singapore, and the International Civil Aviation Organization ("ICAO"), including those of Gold Seal Flight Instructor, Ground Instructor and Aircraft Mechanic. Plaintiff also had experience in positions of Chief Pilot, First and Second Officer, Trainer and General Manager. His most recent experience prior to commencing employment with the Corporate Defendant had been as Director of Training operations.

12. In or about November of 2019, Corporate Defendant's vice president of training and

compliance, recognizing Plaintiff's vast airline experience, began courting Plaintiff with an offer of a job of a Director of Training.

13. In or about December 30, 2019, Plaintiff accepted a position of a Director of Training for Corporate Defendant at JFK Airport in Jamaica, NY ("DOT").

14. Plaintiff's major duties as Director of Training included:

   a. Overall responsibility for training at Corporate Defendant;

   b. Implementing policies and procedures affecting safety training;

   c. Working with Corporate Defendant's senior leadership, customers and the airport officials to improve training procedures so as to maintain the safest possible operational environment for Corporate Defendant and customer employees, passengers and customer assets;

   d. Ensuring that training was properly delivered to Corporate Defendant's employees to allow them to safely perform their required tasks;

   e. Ensuring that proper certifications are held by all those who need them and that such certifications are current.

15. Plaintiff initially reported directly to Frank Baker, Corporate Defendant's Vice President of Training and Compliance at JFK at the commencement of the employment and, subsequently, to Francis Otto, Corporate Vice President and General Manager of JFK Operations.

16. As a DOT, Plaintiff was the only high-level employee of Corporate Defendant at JFK Airport qualified to provide or organize training to incumbent employees.

17. Corporate Defendant's employees engage in extremely important activities that implicate

the safety and lives of thousands of passengers and the overall safety and security at the JFK airport, and in air commerce, such as:

    a.    Towing and pushback of transport category aircraft full of passengers from their designated gates or hard stands;

    b.    Operating heavy lifting equiptment, K-Loaders to load and remove tons of cargo from aircraft as well as operating conveyor belts and carousels while driving airside vehicles (i.e. those vehicles allowed to operate on the airside) to move baggage and cargo under a so-called DR1 endorsement;

    c.    Correctly loading and unloading aircraft within the aircraft manufacturer's certified weight and balance limits, so as to maintain the aerodynamic control of an aircraft in flight;

    d.    Towing aircraft, if required, from active runways and taxiways under the direction of the FAA ATC Tower Ground Controller under the so-called DR3 endorsement.

    e.    Performing safety-sensitive duties, such as Marshaller, GSE Guideperson, Unit Load Devices handler; checking of aircraft, completing Notices to Captain (NOTOC), Loading Instruction Reports, Special Loads, and dealing with broken and inoperable equipment;

    f.    Properly handling dangerous goods in accordance with IATA regulations for both passenger and cargo aircraft;

    g.    Turning around aircraft expeditiously while avoiding injury or damage to property;

      h.      Maitaining a high degree of situational awareness while working at late and odd hours in all sorts of inclement weather conditions and in noisy environments;

      i.      Deicining/anti-icing services as well as snow/ice removal from exterior aircraft surfaces prior to flight;

      j.      Working with external providers such as fueling/defueling operations, toilet servicing, water servicing, passenger services;

      k.      Working airside under the jurisdiction of multiple federal agencies including ICE, U.S. Customs, FAA and Foreign Aviation Safety Inspectors as well as the Port Authority of NY & NJ.

18. A number of the above-mentioned activities require of an employee a specified training and certifications before such an employee can be allowed to perform his or her duties.

19. Numerous airlines serviced by Corporate Defendant's employees, which undergo periodic audits by the Federal Aviation Administration pursuant to 14 CFR §§ 121 and 135, make inquiries regarding the safety training of, and certifications held by, Corporate Defendant's employees who serviced their airplanes. This includes all foreign air carriers certified by their respective national aviation authorities.

20. Immediately after being hired Plaintiff discovered that more than 2/3 of Corporate Defendant's 1500 active employees in the JFK International Airport station had expired training modules or training certificates in one or more classroom or on-the-job training modules. Plaintiff had never been advised of such a shocking safety situation in his several discussions prior to being offered the job. It had been

     Plaintiff's experience in his previous employment in the US, Dubai, Singapore and India, that his employers maintained 100% compliance and and passed periodic random inspections and audits by the FAA or their respective foreign aviation authorities.

21. Upon his discovery, Plaintiff immediately started a major effort to rectify this situation. Paradoxically, the onset of the COVID pestilence helped the matters inasmuch as Corporate Defendant's employee workforce was whittled from 1500 employees to approximately 200 employees and Plaintiff was able to rectify the huge problem in short order.

22. Yet expired training certifications were not the only major safety issue that Plaintiff discovered in the exercise of his duties. Specifically, Plaintiff discovered a culture of falsification of training records, and a cavalier attitude to federal regulations. Among other violations, Plaintiff found:

    a. records of employees completing training after they already left Corporate Defendant;

    b. training records answer sheets with no date of completion or with such a date whited out and a new, altered dates of completion inserted;

    c. undated on-the-job ("OJT") forms in some files to allow insertion of dates later so as to give the appearance that recurrent training had been provided;

23. Plaintiff also discovered yet more violations, such as

    a. on numerous occasions the expired on-the-job ("OJT") training records for particular employees were quickly back-dated and marked completed in

        the Learning Management System (LMS) prior to, or during, an audit by an airline and/or its regulatory representative;

    b.     there were undated DR3 Program examination answer sheets signed by the Corporate Defendant's instructor of the DR 3 Program. This obviated the need for Corporate Defendant's employees to actually take the bi-ennial course and yet still receive the certification.

24.     In the first half of 2020, Plaintiff struggled with the massive fraud he had discovered. Plaintiff implemented a policy that Corporate Defendant's Ground Operations Training fully comply with the rules and regulations of 14 CFR § 121 and §135, so as to increase the safety of the operations with a view to minimizing any accidents to Corporate Defendant and customers' employees, passengers, cargo and equipment.

25.     At all times, Plaintiff brought his concerns about the fraud that he had uncovered and his proposals for change to his then direct report, Frank Baker, as well as GM Francis Otto and later Kevin Frank. Plaintiff noticed in his discussions during weekly Training Meetings that these highest-level leaders of Corporate Defendant at JFK were not happy that Plaintiff was cleaning the proverbial Augean stable of safety training problems and fraudulent practices at Corporate Defendant.

26.     In fact, soon after Plaintiff started his cleanup efforts, his immediate report, Frank Baker, let Plaintiff know that he considered him to be too punctilious and not "flexible" enough regarding problems that Plaintiff had uncovered.

27.     From the beginning of Plaintiff's employment until the end of August, 2020, Baker routinely rejected, limited or diluted Plaintiff's proposals to resolve the problems Plaintiff

had uncovered. Baker often complained that Plaintiff was not "playing ball" with the rest of the Corporate Defendant's team. Baker's complaints increased when, thanks to Plaintiff's efforts, one of the managers who Plaintiff believed engaged in corporate malfeasance, was terminated by the Corporate Defendant.

28. Increasingly, in the exercise of his duties, Plaintiff also felt pressure from Frank Baker, and then Kevin Frank, to work closely with a "Mr. Fix-it", a high-level manager of the Corporate Defendant whom Plaintiff identified as another manager who was engaged in backdating and falsifying training certificates and other corporate documents. At all times, Plaintiff resisted such "cooperation."

29. Then, on August 31, 2020, Frank Baker issued to Plaintiff a Personal Improvement Plan ("PIP"), mandating that Plaintiff should build a working relationships with certain Corporate Defendant's leaders to "enhance teamwork." Having had hitherto experience with Baker, Plaintiff understood Baker's comments in the PIP to mean that Plaintiff was not "playing ball" and was not a "team member" and that Plaintiff should "cooperate" with Corporate Defendant's "Mr. Fix-it".

30. At all times, Plaintiff performed his job duties in a competent, professional, and highly satisfactory manner. Until in or about August 31, 2020, Plaintiff was never disciplined by Corporate Defendant and only received positive evaluations.

31. Despite Baker's retaliatory conduct, Plaintiff continued to execute his duties. In or about January 2021, Plaintiff revoked the on the job training certification of the Director of Operations for Terminal 4, Kevin Frank, because Frank had received an "advanced certification for OJT" from an unqualified mentor. Plaintiff informed Corporate

        Defendant's leadership of the need to revoke Frank's certification because, in Plaintiff's view, Frank lacked the integrity, knowledge, skills or abilities to operate a training department at Corporate Defendant.

32.    Eventually, Frank obtained a legitimate certification and, some time in the middle of 2021, GM Otto appointed Frank as Director of Support Services, such that all of HR, Training and Support were now under Kevin Frank's domain. GM Otto then reassigned Plaintiff to report directly to Frank, knowing that Frank burned with a desire to retaliate against Plaintiff for the embarrassing revocation of the training certificate.

33.    Frank routinely pressured Plaintiff to falsify records by altering the Training Due Dates in the Corporate Defendant's Learning Management System to meet the monthly Key Performance Indicators (KPI) for the Corporate Defendant's Head Office in Dubai. The KPI were set by corporate parent company in Dubai and, among others, contained the percentage of current employee training certificates as one of the indicators of performance. At all times, Plaintiff categorically refused to engage in fraud but noted that, frequently, the records in the Learning Management System had been doctored. Plaintiff routinely complained of these mysterious updates during the weekly management meetings but was ignored.

34.    Despite Plaintiff's efforts to keep all of the employees' training certificates current, Corporate Defendant had problems with one of its largest cargo customers – UPS. UPS required a very large number of employees at all times, but especially during peak times, and had an arrangement with the Corporate Defendant to train its employees. Under the arrangement, Corporate Defendant would train UPS employees only for the first two days

of an employee's employment, and UPS would perform the remainder of the training. However, UPS was reluctant and extremely late with providing its records for the training of the employees, which resulted in a substantial numbers of outdated certificates or missing certificates on a monthly basis in the Corporate Defendant's LMS.

35. On numerous occasions, Plaintiff made proposals to his superiors, first Baker and later Frank, how to resolve this recurring problem but was always ignored by them as UPS was one of Corporate Defendant's largest customers. When Plaintiff complained to the UPS Station Manager, UPS refused to intervene and Plaintiff was advised that this shambolic arrangement with the Corporate Defendant had been standard operating procedure since well before Plaintiff was employed as the DOT. While both Baker and, later, Frank refused to implement changes to the arrangement with UPS, they pressured Plaintiff to falsify such records, which Plaintiff kept refusing.

36. Because Plaintiff refused to engage in fraud, Kevin Frank's hostility towards Plaintiff increased. Yet because Frank was Corporate Defendant's director of Support Services, overseeing all of JFK Human Resources, Plaintiff was unable to report Frank's pressure to have Plaintiff engage in fraud to HR.

37. On November 2, 2021, as retaliation for Plaintiff's refusal to engage in fraud, Frank falsely accused Plaintiff of falsifying an employee's training records and then backed down in setting up a future meeting in Human Resources to discuss it when Plaintiff advised that he would be involving his attorney.

38. In or about February 14, 2022 during the Operations Meeting, Francis Otto and Kevin Frank complained to Plaintiff that Corporate Defendant's LMS showed between 200 and

400 UPS employees' certificates expired, or never having had training at any given time, and that as a Director Plaintiff should rectify this in any way possible. Both Otto and Frank were well aware of the problem and the impossibility to "rectify" this problem overnight in a lawful manner. So, Plaintiff understood that by asking him to "rectify" the problem with outdated or missing certificate dates, both Otto and Frank were in fact asking him to enter fraudulent data into the system. Plaintiff categorically refused.

39. Because of Plaintiff's refusal to fraudulently alter the certification records, Frank calculated that there were in fact 260 UPS employees' certification records that needed to be "resolved." By the close of business on Friday, February 18, 2022, Frank again ordered Plaintiff to falsify Training Records by altering/ pushing back the LMS due dates of those expired modules for the 260 UPS employees to make it appear that all of them were in compliance on the Due List reviewed by Corporate Defendant's HQ in Dubai. When Plaintiff refused to falsify these Training Records, Frank stated to Plaintiff that he was wasting his time and ordered Plaintiff out of the room.

40. On Monday, February 21, 2022 at the Operations Meeting conference call, General Manager Otto himself demanded that Plaintiff was to make the Corporate Defendant's UPS LMS compliance 100% without any employees expired in any training modules, so that they could meet the Corporate Key Performance Indications (KPI) rankings. Plaintiff again refused to falsify the records.

45. The next day, Plaintiff discovered that all 260 records of Corporate Defendant's employees were miraculously in compliance. Upon information and belief, they were fraudulently backdated by someone other than Plaintiff.

46. On March 1 2022, Plaintiff was summarily terminated by GM Otto due to an alleged reduction in flights and that his position of JFK Director of Training was being eliminated and duties would be handled by Kevin Frank, Director of Support Services.

47. Upon information and belief, soon after Plaintiff's termination a manager who thanks to Plaintiff's efforts had been terminated for falsifying records, was rehired by Kevin Frank for Plaintiff's position.

48. Plaintiff's termination was pretextual and was animated by his refusal to engage in document fraud and his efforts to root out fraudulent practices at Corporate Defendant.

49. As a result of Corporate Defendant's unlawful discriminatory acts against Plaintiff, Plaintiff has suffered and continues to suffer impairment and damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation, anguish, and other incidental and consequential damages and expenses.

50. Corporate Defendant's actions were so outrageous, malicious and wanton, and were perpetrated with reckless indifference to Plaintiff's rights and must be punished and deterred through an award of significant damages.

51. Corporate Defendant's retaliatory acts gainst Plaintiff and retaliatory termination were intentional and in violation of the NYLL.

## FIRST CLAIM FOR RELIEF
### Violation of NYLL §740 Against the Corporate Defendant

52. Plaintiff repeats and realleges each and every previous allegation as if fully set forth herein.

53. Plaintiff was qualified to be a Director of Training at Corporate Defendant.

54. New York Labor Law §740 prohibits all employers from discharging, suspending, demoting, or otherwise retaliating against an employee because the employee, among other independent actions, discloses to a supervisor or to a public body an unlawful activity, policy or practice of the employer that creates and presents a substantial and specific danger to the public safety or objects to or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation.

55. Plaintiff uncovered fraud and opposed such fraud and refused to engage in fraudulent altering of documents that ultimately affected public safety and air commerce.

56. Corporate Defendant engaged in retaliatory acts during Plaintiff's employment.

57. Plaintiff suffered an adverse employment action when he was terminated from his employment as Director of Training.

58. Corporate Defendant is liable for said retaliation against Plaintiff because it was created and fostered by its management.

59. The retaliation against Plaintiff by Corporate Defendant was a result of intentional actions by the Corporate Defendant's management and/or deliberate indifference by the Corporate Defendant.

60. As a direct and proximate result of said retaliation, Plaintiff suffered and continues to suffer actual damages, in forms including without limitation future wages, as well as mental anguish.

61. Plaintiff is also entitled to an award damages, punitive damages, attorney's fees, and costs.

WHEREFORE, it is respectfully requested that the Court assume jurisdiction herein

and thereafter Plaintiffs demand a trial by jury and judgment against Corporate Defendant as follows:

    A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New York;

    B.    An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all monetary and/or economic damages;

    C.    An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

    D.    An award of damages to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment;

    E.    An award of punitive damages in an amount to be determined at trial;

    F.    An award of costs that Plaintiff has incurred in this action, as well as Plaintiffs' reasonable attorneys' fees to the fullest extent permitted by law;

    G.    together with such other and further relief that the Court deems just and proper.

Dated: New York, NY
       December 5, 2022

                              ROBERT WISNIEWSKI P.C.

                              By: */s/ Robert Wisniewski*
                                    Robert Wisniewski
                                    *Attorneys for Plaintiff*
                                    17 State Street, Suite 820
                                    New York, NY 10004
                                    Tel.: (212) 267-2101
                                    E-mail: rw@rwapc.com